USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/20/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

RONNISH D. GUPTA,                        :

                      Petitioner,      :         **MEMORANDUM DECISION**

      - against -                   :         12 Civ. 5637 (FM)

ATTORNEY GENERAL OF THE UNITED     :
STATES OF AMERICA,
                                :

                     Respondent.    :
----------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

       Plaintiff  Ronnish Gupta ("Ronnish" or "Gupta") was born in India on May

20, 1980.  He originally filed this proceeding pursuant to 8 U.S.C. § 1252(b)(5)(B) in the

United States Court of Appeals for the Third Circuit.  Gupta seeks to set aside an order

issued by the Board of Immigration Appeals ("BIA").  That order affirmed the decision of

an Immigration Judge ("IJ") requiring Gupta's removal from the United States.  Gupta

asserts that the order should be set aside because he attained derivative citizenship from

his father at the time of his birth pursuant to the former Section 301(g) of the Immigration

and Naturalization Act ("INA") ("Section 301(g)"), 8 U.S.C. § 1401(g) (Supp. III 1980)

(current version at 8 U.S.C. § 1401(g) (2012)).

       To establish his right to citizenship under Section 301(g), Gupta must prove

that his father was a United States citizen and was physically present in the United States

for a total of ten years prior to Gupta's birth.  Because this issue is disputed, the parties

jointly agreed that the Court of Appeals should remand this proceeding to this District,

where Gupta resides, for an evidentiary hearing.  (See ECF No. 2-24 (Resp't's Unopposed Mot. for Transfer)).  Gupta's father lawfully entered the United States on a visitor's visa on November 18, 1971, and was naturalized in 1979.  (Resp't's Ex. A at 2, 14).  The parties therefore have further agreed that Gupta's father was present in the United States for 434 weeks prior to Gupta's birth.  (See ECF No. 25 (Resp't's Pretrial Mem.) at 9; ECF No. 26 (Pet'r's Pretrial Mem.) at 5).

Accordingly, the sole question to be determined is whether Gupta has established that his father was present in the United States for an additional 86 weeks (602 days) prior to November 18, 1971.  Because I find that Gupta has not met his burden in this regard, his application must be denied.  The Court nevertheless urges the Attorney General to exercise his discretion not to remove Gupta from the United States.

I.      Procedural History

The Department of Homeland Security initiated removal proceedings against Gupta on June 22, 2009, after he finished serving a short prison sentence imposed following his plea of guilty to the aggravated felony of conspiracy to commit access device fraud.  (See ECF No. 2 (Certified Copy of Docket Entries from Third Circuit) at 585-87); 08 Cr. 79 (KMK), ECF No. 65 (sentencing Gupta to a term of twelve months and one day, plus three years of probation).  Appearing before the IJ, Gupta contended that he had acquired derivative citizenship through his father, in accordance with Section 301(g), before his conviction.  (ECF No. 2-12 (Certified Administrative Record) at 365, 534-42 (citing the provision as previously numbered, Section 301(a)(7))).  On May 10,

2

2010, after holding an evidentiary hearing, the IJ ruled that Gupta had failed to prove his father's physical presence within the United States for the ten years required under the statute. (Id. at 84-86). Accordingly, the IJ ordered Gupta removed to India. (Id. at 86).

On appeal, the BIA reversed the IJ's decision and remanded the case. (See id. at 76, 269-71). On remand, the IJ again rejected Gupta's claim of derivative citizenship, and on March 29, 2011, ordered him removed. (Id. at 76-80). After the BIA affirmed this decision on September 20, 2011, Gupta appealed to the Court of Appeals for the Third Circuit. (See id. at 3-4; ECF No. 2-19 (Br. for Pet'r)). Finding that a "genuine issue of material fact exist[ed] concerning whether [Gupta] acquired derivative citizenship through his United States citizen father," the Third Circuit granted the Attorney General's unopposed motion to transfer the case to this Court for a hearing pursuant to INA § 242(b)(5)(B), 8 U.S.C. § 1252(b)(5)(B). (ECF Nos. 1, 2-24). Although the case initially was assigned to Judge Pauley, on August 12, 2013, the parties consented to my exercise of jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c). (ECF No. 22). On September 11, 2013, after the parties submitted motions in limine and pretrial briefs, I held the hearing. Thereafter, the parties filed extensive post-hearing memoranda. (ECF Nos. 30, 38, 41).

II.    Summary of Evidence

At the hearing, the parties introduced the following testimony and exhibits, the admissibility and significance of which I will subsequently address.

A.    <u>Margaret Fried</u>

Margaret Fried ("Fried"), a seventy-five year old Holocaust survivor, testified that she met Gupta's father, Ranjit Gupta ("Ranjit"), in 1968 or 1969, while living at 125 West Tremont Avenue in the Bronx.  (Tr. 4-7).  At the time, Fried lived in an apartment on the first floor of the building with her husband, who now suffers from early dementia.  (<u>Id.</u> at 4, 6).  She met Ranjit in the common areas of the building, where the two would greet each other using their limited English.  (<u>See id.</u> at 7).  Fried and Ranjit then became friendly in 1969, and he would sometimes help her with household tasks in her apartment.  (<u>Id.</u> at 8).  Ranjit lived with five other men in an apartment approximately three doors away.  (<u>Id.</u> at 7-8).  One of those men was named "De La Rosa."  (<u>Id.</u> at 8).  Because the men did not have a television set, Ranjit visited the Frieds' apartment at times to watch television.  (<u>Id.</u>).  In particular, Fried remembered watching the moon landing and the Mets' World Series victory with Ranjit in 1969.  (<u>Id.</u> at 8-9).

Fried moved from the West Tremont Avenue building in April 1970, and recalled Ranjit moving "just before," in or around March 1970.  (<u>Id.</u> at 10-11).  When Ranjit left, he told Fried that he was "going to a farm . . . in New York – out of New York . . . [s]omeplace near Lake Champ[lain]," because an employer there had promised to help him secure a "green card."  (<u>Id.</u> at 11).  Fried next heard from Ranjit in September 1970, when he called her "from the farm, and he said [he was] still working there . . . in hopes [of getting] the green card."  (<u>Id.</u> at 11-12).  Following this call, Fried and Ranjit did not speak until 1977 or 1978, when they ran into one another in a New York

4

department store.  (Id. at 12).  After this chance meeting, the two rekindled their

friendship, and Fried became friendly with Ranjit's new wife, Anandita Gupta ("Mrs.

Gupta"), who later became Gupta's mother.  (Id. at 13).  The families remained in contact

up to the date of the hearing, and at some point Fried found a job for Mrs. Gupta at

Loehmann's Department Store, where Fried also worked part time.  (Id. at 5, 13).

       B.    <u>Mrs. Gupta</u>

       Mrs. Gupta testified that Ranjit died in 2002.  (Id. at 20).  She and Ranjit

married in 1976, while he was living in New York and she was in India.  (Id. at 20-21).

Ranjit came to India for the wedding, and Mrs. Gupta joined him in New York the

following year, in 1977.  (Id. at 21).  The couple had three sons:  Dennis, Ronnish, and

Tony.  (Id.).  Dennis and Tony were born in the United States, but Ronnish was born in

Calcutta, India.  (Id. at 21-22).  Two months after Ronnish's birth, Mrs. Gupta brought

him to New York, where he received a green card at the airport.  (Id. at 23).  The only

time Ronnish returned to India was at the age of four, when the family attended Mrs.

Gupta's brother's wedding.  (Id. at 23-24).

       Ranjit explained to Mrs. Gupta that he had come from Canada to the United

States illegally in 1968.  (Id. at 24).  While here, he lived in the Bronx with five other

men.  (Id. at 24-25).  Mrs. Gupta later met and became friendly with one of these men, De

La Rosa, but he then purchased a house in the Dominican Republic and moved there.  (Id.

at 25).  Ranjit also told Mrs. Gupta that he had moved to a farm upstate in 1969 or 1970,

and had returned to Germany in 1971 so that his employer on the farm could sponsor his

legal return to the United States.  (Id. at 25).  He also told her that he had a girlfriend in Germany whom he wanted to marry, but that his father had given him an "ultimatum" – he could either marry the German woman or have a relationship with his family.  (Id. at 25-27).

Mrs. Gupta also testified that she had found two passports belonging to her husband, which she provided to her immigration attorney.  According to her, one of the passports had been "ripped" by her children, who also used it to "sketch[] and everything."  (Id. at 27).

C.    Rathin Gupta

Rathin Gupta ("Rathin") is Ranjit's brother and Gupta's uncle.  He was born in Calcutta, India, and moved to the United States at the age of 29 under Ranjit's sponsorship.  (Id. at 32, 39).  Their father had been a police officer in India, but was receiving a pension during Rathin's childhood, placing a strain on the family's financial situation.  (Id. at 33).  In 1963, Ranjit moved to Germany for a job opportunity.  (Id. at 34).  While Ranjit was in Germany, he communicated with the family through letters, sent money, and called on Rathin's birthday.  (Id. at 34-35).

According to Rathin, Ranjit returned home from Germany in October 1968 for about one month to spend the religious holiday of Durga Puja with his family.  (Id. at 35-36).  When he left India, Ranjit told his father, who then told the rest of the family, that Ranjit was going to America.  (Id. at 36).  Ranjit then wrote to the family "from time to time," informing them that he was working in the United States and, occasionally,

6

sending money.  (Id. at 37).  The first letter arrived in December 1968.  (Id. at 40).  There

was a period in or around April or May of 1970 when his letters stopped arriving for a

month or two.  After that hiatus, Ranjit wrote stating that he was working on a farm in

upstate New York.  (Id. at 38-39).  Rathin never personally read one of Ranjit's letters,

but he knew they existed because he would retrieve them from the mailbox and hand

them to his father.  (Id. at 37).  Although he lacked first-hand knowledge regarding the

origin of the letters, Rathin testified that he would "have noticed a difference between a

German, Canadian or U.S. postmark."  (Id. at 40).

        D.     <u>Hari Dutta Gupta</u>

        Hari Dutta Gupta ("Hari") is Ranjit's other brother.  He was born in

Calcutta, India, and moved to the United States at the age of 39 or 40 under Ranjit's

sponsorship.  (Id. at 42-43).  Like Rathin, Hari recalled Ranjit living in Germany and

returning to India for Durga Puja in October 1968.  (See id. at 44-46).  After Durga Puja,

Ranjit had a conversation with Hari, during which he "mentioned that he was going to the

U.S."  (Id. at 46).  Hari considered the news exciting because "America is the richest

country, everybody wants to come to the U.S.," and no one in the family had ever lived

there before.  (Id. at 46-47).

        According to Hari, the family lost touch with Ranjit for approximately one

and one-half months starting in March 1970.  (Id. at 47-48).  When they next heard from

him, in or around May 1970, he reported that he had taken a job on a farm in upstate New

York.  (Id. at 48).  Although Hari never read any of Ranjit's letters, he saw them arrive in the mail and could tell that they bore United States stamps.  (Id. at 47, 49).

E.    Gupta's Exhibits

Gupta introduced three exhibits, to which the Defendant did not object:  two passports belonging to Ranjit (Pet'r's Exs. A, B), and Ranjit's Certificate of Naturalization (Pet'r's Ex. C).  (Id. at 50).  Ranjit's first passport, which was issued in 1963, was renewed in late 1965 and remained valid until January 10, 1969.  (Pet'r's Ex. A).  This passport reflects Ranjit's travels to and from Germany and other European countries between 1963 and 1967, as well as his departure from India on November 18, 1968.  (Id. at 8-20).  It is impossible to tell when or where Ranjit's second passport was issued because nine pages are missing from the exhibit.  Several of those are pages where visa stamps could have been placed.  Despite the missing pages, the second passport does indicate that it was renewed in Hamburg, Germany, on August 26, 1971, and was valid for travel to the United States and Canada, as well as the "U.A.R." and Lebanon.  (Pet'r's Ex. B at 6, 11).  This passport also includes Ranjit's B-1 visa for entry into the United States, dated November 16, 1971.  (Id. at 13).

Ranjit's Certificate of Naturalization shows that he naturalized on June 6, 1979.  (Pet'r's Ex. C).

F.    Ranjit Gupta's A-File

Over Gupta's objection, the Respondent sought to admit a certified copy of Ranjit's Alien File ("A-file") in its entirety.  (Resp't's Ex. A; Tr. 50).  The A-file includes

8

Ranjit's Application to File Petition for Naturalization, dated May 9, 1978.  (Resp't's Ex. A at 7-8).  According to that document, Ranjit worked as a tea taster in Cobbleskill, New York, from November 1971 to November 1973, and as a welder in Brooklyn, New York, from June 1974 to the date of his filing for naturalization.  (<u>Id.</u> at 7).  Also included in the A-file is Ranjit's Application for Status as Permanent Resident, in which he represented that he "last arrived in the United States" at Champlain, New York, on November 18, 1971.  (<u>Id.</u> at 13).  Ranjit did not respond to an item that asked whether he had been absent from the United States since his first entry and inserted "[n]ot applicable" on the line intended to show the place and date of his first entry into the United States.  (<u>Id.</u> at 14).  Ranjit's Statement of Qualifications of Alien, filed in connection with his 1972 Application for Alien Employment Certification, represents that he worked from 1968 to November 1971 for Friedr. Wilh. Lange in Hamburg, Germany.  (<u>Id.</u> at 20-21).  Friedr. Wilh. Lange also filed a letter, dated September 24, 1972, certifying that Ranjit had trained and worked in Germany for five years.  (<u>Id.</u> at 22).

III.     <u>Applicable Law</u>

An alien who seeks review of an order of removal must file his petition with the court of appeals for the circuit in which the IJ held the proceedings.  8 U.S.C. § 1252(b)(2).  Here, those proceedings took place in York, Pennsylvania, in the Third Circuit.  (<u>See</u> ECF No. 2-12 at 76).  When a case such as this subsequently is transferred to a district court for a hearing, the alien is placed in the position of a plaintiff seeking a declaratory judgment from the transferee court stating that he is a United States citizen in

an action "under section 2201 of Title 28." 8 U.S.C. § 1252(b)(5)(B). Accordingly, the plaintiff bears the burden of proving his case by a preponderance of the evidence. See Berenyi v. Dist. Dir., INS, 385 U.S. 630, 637 (1967); United States v. Scott, 919 F. Supp. 2d 423, 428 (S.D.N.Y. 2013). Further, because granting citizenship is not a matter to be taken lightly, "doubts should be resolved in favor of the United States and against the claimant." Berenyi, 385 U.S. at 637 (internal quotation marks omitted).

       Gupta acknowledges that he has the burden of proving any disputed elements of his citizenship claim by a preponderance of the evidence. (ECF No. 30 (Pet'r's Post-Hearing Mem.) at 2). He nevertheless urges the Court to keep in mind "the purposes of the derivative citizenship statute and the immigration laws," which are to "'preserv[e] . . . the family unit.'" (Id. at 3 (quoting Duarte-Ceri v. Holder, 630 F.3d 83, 90 (2d Cir. 2010))). Gupta further maintains that there is "'a long-standing presumption [in immigration cases] to construe any lingering ambiguities in favor of the petitioner.'" (Id. (quoting Duarte-Ceri, 630 F.3d at 89)). Gupta fails to note, however, that the "ambiguities" to which this presumption applies relate to the statutes themselves, not to the evidence presented by a petitioner. See INS v. Cardozo-Fonseca, 480 U.S. 421, 449 (1987). There are no such ambiguities in the statutory provisions here.

       In 1986, Congress amended Section 301(g) to reduce the period a parent had to be physically present in the United States in order to transmit his citizenship to his child at the time of the child's birth. See INA Amendments of 1986, Pub. L. No. 99-653 § 12, 100 Stat. 3655, 3657 (1986). Nevertheless, "[t]he applicable law for transmitting

citizenship to a child born abroad when one parent is a [United States] citizen is the statute that was in effect at the time of the child's birth." Drozd v. INS, 155 F.3d 81, 86 (2d Cir. 1998) (quoting Runnett v. Schultz, 901 F.2d 782, 783 (9th Cir. 1990)).  Both parties agree that Gupta therefore must prove, by a preponderance of the evidence, that Ranjit was physically present in the United States for a total of ten years prior to Gupta's birth on May 20, 1980.  (See Resp't's Pretrial Mem. at 3 n.2; Pet'r's Pretrial Mem. at 2). Notably, the statute does not require those ten years to be continuous.

IV.   Admissibility of Evidence

A.   Witness Testimony

The Respondent contends that Mrs. Gupta, Rathin, and Hari did not have personal knowledge as to Ranjit's whereabouts between 1969 and 1972, and instead based their testimony on uncorroborated hearsay.  (ECF No. 38 (Resp't's Post-Trial Mem.) at 4).  The Respondent further maintains that portions of Fried's testimony also contain inadmissible hearsay.  (Id. at 8 n.5).  Hearsay is an out-of-court statement offered to prove the truth of the matter asserted;  it is inadmissible unless the statement falls within a recognized exception to the general hearsay rule.  Fed. R. Evid. 801, 802.

1.   Non-Hearsay

Contrary to the Respondent's assertion, several members of Gupta's family did have personal knowledge of relevant facts regarding the time period at issue.  Indeed, both Rathin and Hari testified that they personally had seen the letters that Ranjit sent to their home in India during his travels.  (Tr. 37, 49).  Rathin further testified that he could

11

distinguish between United States and German stamps, and Hari testified that Ranjit's letters bore United States stamps.  (Id. at 40, 49).  Accordingly, both Rathin and Hari testified from personal knowledge to the extent they described the arrival and appearance of the letters, as well as their approximate dates of receipt.[1]

2.     Statements of Personal or Family History

Federal Rule of Evidence 804(b)(4) provides an exception to the hearsay rule for statements by an unavailable declarant about "(A) the declarant's own birth, adoption, legitimacy, ancestry, marriage, divorce, relationship by blood, adoption, or marriage, or similar facts of personal or family history, even though the declarant had no way of acquiring personal knowledge about that fact; or (B) another person concerning any of these facts, as well as death, if the declarant was related to the person by blood, adoption, or marriage or was so intimately associated with the person's family that the declarant's information is likely to be accurate."  Rule 803(19) provides a parallel exception, without regard for the declarant's availability, for statements about a person's "reputation among [his] family by blood, adoption, or marriage" concerning these same topics.

---

[1]     Their assertion that Ranjit sent his letters while living in the United States is, however, hearsay.  The only sources from which the brothers could have learned this alleged fact are their father or the return addresses on the envelopes.  Both the information that their father related to them and the name and address written on the envelope are hearsay if offered to prove that Ranjit was living in the United States.  See United States v. Singer, 687 F.2d 1135, 1147 (8th Cir. 1982) (address on letter, if offered to prove "the implied truth of its written contents," i.e., that defendant lived at address, is hearsay).

Gupta contends that the testimony of his family members regarding his father's travels falls within the exceptions for statements about "similar facts of personal or family history."  (See ECF No. 27 (Pet'r's Opp. to Resp't's Mot. in Limine) at 3-7). This phrase is defined in neither the rules nor the advisory committee notes, but the Second Circuit recently considered its meaning in Porter v. Quarantillo, 722 F.3d 94, 98-99 (2d Cir. 2013).  In that case, the plaintiff sought to introduce an affidavit sworn to by his mother for the proposition that when she "was between one . . . and two years old, [she] moved to St. Vincent and the Grenadines."  Id. at 98 (internal quotation marks omitted).  The court explained that the theory behind the hearsay exceptions is that "certain categories of statements are free enough from the risk of inaccuracy and untrustworthiness . . . that the test of cross-examination would be of marginal utility."  Id. at 98 (internal quotation marks omitted).  The family history exception in particular is premised on the notion that "statements of family history 'are likely to be informed by knowledge shared in common among family members on the basis of customs and understandings that are likely to be true.'"  Id. (quoting 5 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 8:133, at 225 (3d ed. 2007)).  The test at common law was whether "the circumstances named in the statement [were] such a marked item in the ordinary family history and so interesting to the family in common that statements about them in the family would be likely to be based on fairly accurate knowledge and to be sincerely uttered."  Id. (quoting 5 Wigmore, Evidence § 1502, at 400 (Chadbourn rev. 1974)).  The Porter court concluded that "a change in one's country of residence or in

13

one's citizenship might, like the date of one's birth, death, or marriage, be a matter of interest within a family," but that the precise age at which such a change occurred likely would not. Id. at 98-99. The statement in the plaintiff's mother's affidavit therefore was held to be inadmissible.

Gupta argues that the statements his grandfather made to his uncles, or his father made to his mother, fall within these exceptions as statements of "similar facts of personal or family history." Even if he is correct that the family's pride and excitement regarding his father's move to the United States elevated the fact of his move to the level of a birth, death or marriage, it does not follow that the dates of Ranjit's travels to and from this country were similarly important. Accordingly, any testimony by the Gupta family witnesses regarding the dates of Ranjit's travels to and from the United States that is based on hearsay is inadmissible.

       3.    <u>State of Mind</u>

The Respondent argues that the Gupta brothers' testimony that Ranjit left India for the United States in 1968 is similarly based on hearsay. However, under the rule first announced in <u>Mutual Life Insurance Co. of New York v. Hillmon</u>, 145 U.S. 285, 295-96 (1892), statements that show a declarant's state of mind are not excluded. <u>See</u> Fed. R. Evid. 803(3). Indeed, such statements are admissible not only to show the declarant's intention, but also as proof "that the declarant thereafter acted in accordance with the stated intent." <u>United States v. Best</u>, 219 F.3d 192, 198 (2d Cir. 2000).

14

Both Rathin and Hari testified that they were told that Ranjit intended to go to the United States after leaving India in late 1968. However, Rathin testified only that Ranjit told this to their father, who in turn informed the rest of the family. (Tr. 36). Each layer of hearsay contained within a statement must fall within an exception. Fed. R. Evid. 805. The father's statement to Rathin does not fall within the Rule 803(3) exception because it relates to his son's intentions, not his own. Accordingly, the entire statement must be excluded.

Hari, on the other hand, testified that Ranjit personally told him that he was going to the United States. (Tr. 46). This statement shows that, "shortly before the time when other evidence tend[s] to show that he went [to the United States], he had the intention of going, . . . which made it more probable . . . that he did go . . . than if there had been no proof of such intention." Hillmon, 145 U.S. at 296. Hari's testimony therefore is admissible to prove Ranjit's intention and to show that Ranjit thereafter acted in accordance with his expressed intention. Best, 219 F.3d at 198.

Similarly, Fried testified that when Ranjit was moving out of her apartment building, he told her that he was "going to a farm . . . near Lake Champ[lain]." (Tr. 11). This statement is admissible under the Hillmon exception as well to show Ranjit's state of mind at the time of the move, and that he "thereafter acted in accordance with [his] stated intent." Best, 219 F.3d at 198.

15

4.    <u>Residual Exception</u>

Rule 807 permits a party to use otherwise-inadmissible hearsay evidence

when each of four conditions is met.  The statement must:  (A) have "circumstantial

guarantees of trustworthiness" equivalent to other hearsay exceptions; (B) be "offered as

evidence of a material fact;" (C) be "more probative on the point for which it is offered

than any other evidence that the proponent can obtain through reasonable efforts;" <u>and</u>

(D) "best serve the purposes of" the rules of evidence and "the interests of justice."  Fed.

R. Evid. 807(a).  Additionally, the proponent must give the adverse party "reasonable

notice of the intent to offer the statement and its particulars . . . so that the party has a fair

opportunity to meet it."  Fed. R. Evid. 807(b).  Although one could interpret the exception

broadly, "Congress intended that [it] . . . be used very rarely, and only in exceptional

circumstances."  <u>Parsons v. Honeywell, Inc.</u>, 929 F.2d 901, 907 (2d Cir. 1991) (internal

quotation marks omitted).

This is not such a circumstance.  Whatever the interests of justice may be,

Rathin's recitation of statements made to his father and every witness's statements

concerning the dates of Ranjit's travels do not have the necessary "equivalent

circumstantial guarantees of trustworthiness."  Fed. R. Evid. 807(a)(1).  In testing

whether proffered evidence carries such guarantees, a district court must assess its

"ability to minimize some of the four classic hearsay dangers":  the risks of insincerity,

faulty perception, faulty memory, and faulty narration.  <u>Schering Corp. v. Pfizer, Inc.</u>, 189

F.3d 218, 233 (2d Cir. 1999).  The statements proffered by Gupta that fall outside

recognized hearsay exceptions in no way minimize these dangers.  If anything, the

passage of time has exacerbated them.  Accordingly, even if the statements would be

more probative than other evidence, and even if their exclusion does not further the

interests of justice, the residual hearsay exception does not permit a court to consider

statements of such dubious reliability.

5.    Waiver of Objection

At the hearing, Fried testified that Ranjit called her in September 1970 and

told her that he was still in New York State.  (Tr. 11-12).  The Respondent argues that

Ranjit's statement to Fried is inadmissible hearsay.  (Resp't's Post-Trial Mem. at 8 n.5).

Gupta does not argue that the statement falls into any particular exception to the hearsay

rule, but nevertheless contends that it should be received because the Respondent failed to

object to its admission until the post-trial briefing stage and, therefore, has waived the

objection.  (ECF No. 41 (Pet'r's Post-Trial Reply ("Reply")) at 3 n.1 (citing Fed. R. Evid.

103(a); Booth Oil Site Admin. Grp. v. Safety-Kleen Corp., 194 F.R.D. 76, 81 (W.D.N.Y.

2000))).

At the outset of the hearing, I instructed counsel that I planned not to make

"any evidentiary rulings with respect to hearsay, but simply [to] hear all of the evidence"

and then "decide that which is admissible."  (Tr. 2).  Given this admonition, it is

understandable that counsel for the Respondent would refrain from making objections

and wait to raise the issue in post-hearing briefs.  Indeed, with the exception of two

objections related to improper impeachment, neither side voiced any objections – on

hearsay grounds or otherwise – during the evidentiary hearing.  (See id. at 4-49).  Further, Gupta had the opportunity to respond to the Respondent's objection, and did so in his post-hearing reply.  (See Reply at 3 n.1).  In these circumstances, I reject the suggestion that the Respondent's objection has been waived.

Since the Respondent challenges the admissibility of Fried's testimony concerning the September 1970 telephone call, Gupta has the obligation to establish a legal basis for its admissibility.  See United States v. Pugliese, 712 F.2d 1574, 1580 (2d Cir. 1983) ("Unless the basis for proposed admission is obvious, it is the burden of counsel who seeks admission to alert the court to the legal basis for his proffer.").  Despite having been afforded an opportunity to respond, Gupta has failed to cite any hearsay exception applicable to Fried's testimony concerning the substance of the call.  Having failed to suggest any basis for admissibility other than waiver, Gupta has not shown that the contents of Fried's telephone conversation fall within an exception to the hearsay rule.  That aspect of Fried's testimony therefore is inadmissible.

B.     Ranjit's A-File

During the hearing and in a motion in limine, Gupta objected to the admission of certain portions of Ranjit's A-file, arguing that they (1) did not fall within any recognized exception to the hearsay rule, and (2) were irrelevant.  (ECF No. 27 at 7-11; Tr. 50).  The Respondent counters that the entire A-file should be admitted under the ancient documents hearsay exception, among others.  (See ECF No. 28 at 4-6).  Under the ancient documents exception, statements contained in documents that are "at least 20

18

years old and whose authenticity is established" are admissible.  See Fed. R. Evid.

803(16).

        Following the hearing, Gupta has conceded that the statements in Ranjit's

A-file fall within this exception to the hearsay rule.  (ECF No. 43 (Letter from Deborah

Colson to the Court, dated Sept. 18, 2013) at 1).  Gupta nevertheless contends that the

Court should disregard the A-file or accord it little weight because it is unreliable,

inasmuch as it conflicts with witness testimony, and because Ranjit had "every incentive

to lie" because "disclosure of his prior, illegal residence in the United States might have

adversely impacted his green card application."  (Id. at 2).   As Gupta concedes, however,

reliability affects the weight to be given to ancient documents, not their admissibility.

See George v. Celotex Corp., 914 F.2d 26, 30 (2d Cir. 1990); United States v. Portrait of

Wally, 663 F. Supp. 2d 232, 254-55 (S.D.N.Y. 2009).  Accordingly, notwithstanding

Gupta's objections to the trustworthiness of the statements contained in the A-file, the

entire file will be received under Rule 803(16).

V.      Admissible Evidence Before the Court

        Therefore, to the extent relevant, the following evidence regarding the

length of Ranjit's stay in the United States is before the Court:

        In late 1968, Ranjit lived in India with his family.  At that time, he told his

brother Hari that he intended to go to the United States.  After he subsequently left India,

a letter bearing United States postage arrived at his family's home in India in December

1968.  Some time in 1968 or 1969, Fried met Ranjit in her building at 125 West Tremont

19

Avenue in New York.  On July 20, 1969, Ranjit was in Fried's apartment there watching the moon landing.  In October of that same year, he again was in her apartment watching the Mets win the World Series.  He moved from the West Tremont building in March 1970, at which time he told Fried that he intended to go to a farm "near Lake Champ[lain]."  In September 1970, Fried received a phone call from Ranjit.  Thereafter, on November 18, 1971, Ranjit entered the United States on a non-immigrant visitor  B-1 visa.  In 1973, Ranjit applied for permanent resident status.  In his application, Ranjit stated that he last arrived in the United States on November 18, 1971.  He made no mention of having lived here earlier.  Indeed, his 1972 application for employment certification represents that he was in Germany from 1968 until November 1971.  Ranjit's passports reflect his departure from India in 1968 and his travel from Germany to the United States in 1971.  Ranjit became a naturalized citizen in 1979.

VI.    Merits of Gupta's Claim

Because the parties stipulate that Ranjit was physically present in the United States for a total of 434 weeks during the period from November 18, 1971, when he entered legally, to Gupta's birth on May 20, 1980, the only issue to be decided is whether Ranjit was present for the additional 86 weeks (602 days) necessary to achieve the ten-year requirement.  Unfortunately, as the IJ correctly concluded, Gupta has not met his burden.  His petition for a declaration of citizenship therefore must be denied.

Although I credit the testimony of Fried and, to a certain extent, the Gupta family witnesses, the evidence before the Court fails to establish with sufficient certainty

20

the dates of Ranjit's initial departure from the United States.  Accordingly, even if Ranjit entered the United States in December 1968, Gupta has not shown that Ranjit remained here until at least July or August 1970, which would be necessary for him to establish Ranjit's physical presence for 86 weeks prior to 1971.[2]

      A.      <u>Ranjit's Arrival Date</u>

          Rathin and Hari both testified that their brother left India in late 1968, and that the family then received letters bearing United States postage "from time to time." (Tr. 36-37, 47, 49).  On cross-examination, Rathin stated that the first letter the family received arrived in December 1968.  (<u>Id.</u> at 40).  Fried could not remember the date she met Ranjit for the first time, but testified that she watched the moon landing on July 20, 1969,[3] and the Mets' World Series victory in October 1969,[4] with him.  It is reasonable to assume that Fried would not have invited Ranjit into her apartment immediately after she

---

      [2]      The critical 602nd day falls somewhere in July or August 1970.  Assuming that Gupta entered the country on the first day of December, he would have had to remain present continuously through July 26, 1970.  If he entered the country on the last day of December, he would have had to remain present continuously through August 25, 1970.  <u>See</u> <u>Calculate Duration Between Two Dates</u>, http://www.timeanddate.com/ date/duration.html (last visited March 13, 2014).

      [3]      Although Fried testified only that the moon landing occurred in 1969, (Tr. 9), the Court can take judicial notice that it in fact occurred on July 20, 1969.  <u>See</u> Fed. R. Evid. 201; <u>July 20, 1969: One Giant Leap For Mankind</u>, NASA, http://www.nasa.gov/mission_pages/ apollo/apollo11_40th.html#.Uw9yF_uFt8E (last visited March 14, 2014).

      [4]      The Court similarly takes judicial notice that the Mets won the World Series on October 16, 1969.  <u>Mets Timeline</u>, Mets, http://newyork.mets.mlb.com/nym/history /timeline1.jsp (last visited March 14, 2014).

first met him.  Accordingly, I will assume, for present purposes, that Ranjit in fact arrived in New York City in December 1968.

      B.    <u>Ranjit's Departure Date</u>

      Assuming that Ranjit arrived in the United States in December 1968, Gupta still would have to prove – through admissible evidence – that his father remained here continuously until at least July or August 1970.  Although Fried testified that she received a phone call from Ranjit in September 1970, the contents of that call are inadmissible hearsay.  Thus, Gupta cannot establish the location from which the call was placed.

      Even if Gupta were able to show that Ranjit called Fried from the United States in September, he still has not shown, as he must, that Ranjit remained in the United States throughout the period from when he left New York until July or August 1970.  The evidence regarding Ranjit's passports is particularly troubling in that regard.  Ranjit's first passport was issued on January 11, 1963, in Calcutta, with an indication that it would expire on January 10, 1966, "[u]nless renewed."  (Pet'r's Ex. A at 0, 4).  That passport was renewed on November 10, 1965, with a final expiration date of January 10, 1969.  (<u>Id.</u> at 6).  It thus appears that during the relevant period the Indian government issued passports for three years with the possibility of one three-year renewal.

      Gupta claims that Ranjit's second passport was <u>issued</u> on August 26, 1971.  (<u>See</u> Pet'r's Post-Hearing Mem. at 9).  The passport, in fact, was <u>renewed</u> on that date with a final expiration date of January 26, 1975.  (Pet'r's Ex. B at 6).  It thus appears that the second passport would have been issued on or about January 26, 1969, assuming it

22

was valid for an initial three-year period.  Where it was issued is, of course, a mystery.

Although my assumption concerning the initial issuance of the second passport involves a

certain degree of speculation, Gupta bears the burden of proof, however modest, with

respect to Ranjit's whereabouts during the period from approximately December 1968

through July or August 1970.  Here, the fact that eight pages are missing from Ranjit's

second passport virtually compels the conclusion that their contents would not have

supported Gupta's petition.  Indeed, those pages would have shown when and where

Ranjit's second Indian passport was issued and any additional visas that he may have

received before the passport was renewed.  Gupta's mother sought to explain away the

alteration of the passport by testifying that her "kids used to play with it," "ripped" it, and

apparently also used it in some unexplained way to "sketch."  (Tr. 27).  The fact that the

helpful pages of the passport survived, and that only the potentially harmful pages

disappeared, renders her testimony in this regard inherently unbelievable.  In any event,

even if I were to credit this testimony – which I do not – Gupta has the burden of

establishing by a preponderance of the evidence that his father remained in the United

States continuously from the date of the Mets victory through at least July or August

1970.  Simply put, there is no such evidence in the record.

       At best, Fried's testimony, taken together with Hari's testimony regarding a

gap in Ranjit's letters, establishes that Ranjit remained in the United States until March

1970.  There is no admissible evidence to support the conclusion that he then remained in

the United States continuously until July or August 1970.  Moreover, the spoliation of the

passport strongly suggests that he did not.

Ultimately, Gupta has the burden of proof.  <u>Berenyi</u>, 385 U.S. at 637.  Any

doubts concerning his eligibility for citizenship also must be resolved against him.  <u>Id.</u>

Here, Gupta has not met his burden and there are numerous doubts as to the veracity of

his derivative citizenship claim.  For these reasons, the petition must be denied.

VII.   <u>Further Observations</u>

Gupta evidently concedes that the crime to which he pleaded guilty is an

aggravated felony under 8 U.S.C. § 1101(a)(43)(M), (U).  Accordingly, unless there is a

finding that Gupta is a citizen, the Attorney General has the right to remove him from the

United States.  <u>See</u> 8 U.S.C. §§ 1227, 1228.  The Attorney General, however, retains the

discretion to "decline to institute proceedings, terminate proceedings, or decline to

execute a final order of deportation."  <u>See</u> <u>Reno v. Am.-Arab Anti-Discrimination</u>

<u>Comm.</u>, 525 U.S. 471, 484 (1999) (quoting 6 Charles Gordon, <u>et al.</u>, <u>Immigration Law</u>

<u>and Procedure</u> § 72.03(2)(h) (1998)).  Absent a showing of selective enforcement, this

Court clearly has no jurisdiction to review a decision to decline to exercise that discretion.

8 U.S.C. § 1252(g); <u>see</u> <u>Reno</u>, 525 U.S. at 483-85.

In deciding whether to exercise discretion, Immigration and Customs

Enforcement ("ICE") officials are guided by priorities outlined in the so-called "Morton

Memoranda."  <u>See</u> Memorandum from John Morton, ICE Dir., to All ICE Employees

(Mar. 2, 2011) ("Subject:  Civil Immigration Enforcement:  Priorities for the

24

Apprehension, Detention, and Removal of Aliens" ("Mar. 2011 Mem.")); Memorandum

from John Morton, ICE Dir., to All Field Office Directors, All Special Agents in Charge,

All Chief Counsel (June 17, 2011) ("Subject:  Exercising Prosecutorial Discretion

Consistent with the Civil Immigration Enforcement Priorities of the Agency for the

Apprehension, Detention, and Removal of Aliens" ("June 2011 Mem.")).  Among the

factors that officials may consider are "the person's length of presence in the United

States, with particular consideration give to presence while in lawful status . . . ; the

person's ties and contributions to the community, including family relationships; [and]

the person's ties to the home country . . . ."  (June 2011 Mem. at 4).  Officials also are

encouraged to consider "the agency's civil immigration enforcement priorities."  Id.

Although these priorities include "aliens convicted of crimes" in the top tier of

enforcement priorities, the agency is particularly focused on "those who have committed

violent crimes."  Akinsade v. Holder, 678 F.3d 138, 146-47 (2d Cir. 2012); (Mar. 2011

Mem. at 2).

        Here, there is no dispute that Gupta has spent his entire life in the United

States as a lawful permanent resident.  He graduated from United States schools and, with

the exception of what appears to have been a brief indiscretion, has acted as a productive

member of society.  He clearly has a supportive family network here, and has spent

virtually no time in India.  He does not speak Hindi, and the crime of conspiracy to

commit access device fraud is not a crime of violence.

For these reasons, although the Court cannot grant Gupta derivative citizenship, it urges the Attorney General and ICE to give serious consideration to not removing Gupta from the United States.

VIII.   Conclusion

For the reasons set forth above, Gupta's petition seeking a declaration that he is a United States citizen is denied.  Additionally, the Clerk of the Court is directed to close the parties' motions in limine (ECF Nos. 24, 27).  The Court nevertheless urges the Attorney General and ICE to reconsider their discretionary decision to remove Gupta from the United States.

SO ORDERED.

Dated:      New York, New York
            March 20, 2014

FRANK MAAS
United States Magistrate Judge

Copies to All Counsel via ECF

26